**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| WILLIAM ASAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 10-cv-643-TLW |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff William Asay, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying his applications for disability benefits under Titles II and XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 11). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

**Review**

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security

regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

## Background

Plaintiff was born August 7, 1958 and was 51 years old at the time of the ALJ's decision. (R. 92, 100). He is married with four children. (R. 39, 93). He completed three years of college. (R. 38). He last worked November 7, 2007 as a truck driver. Prior to that, he worked as a nurse for 10 years. (R. 39).

## Hearing Summary

A hearing was held June 15, 2009, in front of Administrative Law Judge ("ALJ") Lantz McClain. During his opening argument, plaintiff's attorney noted that plaintiff's physicians were unable to agree upon a cause for plaintiff's symptoms of pain. He stated that Exhibits 6F and 8F touched on the possibility of a somatoform[1] disorder, and he suggested that further development of the record was in order. (R. 36-37).

Upon questioning by his attorney, plaintiff explains that he has neck pain which makes it difficult for him to turn his neck to the left, even choking him at times. His left shoulder also causes him "an immense amount of pain." (R. 40). Plaintiff claims the grip in his hands is unsteady. His balance is off, and he claims he is unable to move his left leg to use the clutch on a vehicle. Id. Plaintiff states his lack of balance makes him unsteady and causes him to fall frequently, forcing him to use a cane. Id. He states his grip problem is in both hands, but more in the left. (R. 41). In explaining his shoulder pain, plaintiff said "[m]oving it, lifting it up[,] [t]rying to reach out for things" all make the pain worse. (R. 43). He has trouble sitting in one position for too long, especially if the chair is hard. He has an extra cushion in his recliner at home. Id.

---

[1] A somatoform disorder is a group of psychiatric disorders which can cause unexplained physical symptoms. See http://www.aafp.org/afp/2007/1101/p1333.html.

Plaintiff estimates he can stand or walk without a break for approximately 20 minutes. His legs, back, arms, and hands get tired if he stands or walks too long, in which case he needs to rest for approximately 30 minutes or more. (R. 44, 45). He explained that he uses a cane "outside, once in a while, in the house, if I'm having a real bad day," but always carries it with him. Id. Inside his house, he has things he can lean on or hold onto for support. (R. 45).

Plaintiff says he can only lift five (5) pounds before his left arm begins hurting "severely," five to ten pounds with his right. (R. 46-47). He claims the limiting factor with his left arm is pain in his shoulder; his right is pain in his hands. (R. 47). He is unable to type with more than two fingers. Id. He said his wife buttoned his shirt for him. (R. 48). He has a large buttoned phone at home, and he cannot use a cell phone. (R. 49). He becomes exhausted folding laundry. Id. He spends 80 percent of his waking hours resting or lying down. (R. 50).

Plaintiff says he is no longer able to help with household chores such as vacuuming and dusting. (R. 52). His drivers' license was suspended, and his wife drives him now. He claims to be unable to retain the details of a half hour television program. (R. 52-53). He enjoys fishing and camping, but cannot participate in these activities, because he is unable to tolerate the changes in temperature. (R. 54). He shops infrequently and for short periods. (R. 55).

Next in the hearing, the ALJ turned to the Vocational Expert ("VE"), prompting him to let them all know if his testimony differed from the Dictionary of Occupational Titles ("DOT") as he went. First, the VE summarized plaintiff's prior work history, then the ALJ gave him the following hypothetical:

> [L]et's say we have an individual who's the same age, same educational background and the same work history as this claimant. Let's say that individual was limited to light work as described by the Commissioner, that is, could occasionally lift and carry 20 pounds. Frequently carry 10 pounds. Stand and/or walk with six out of an 8-hour workday and sit at least six hours of 8-hour workday. Let's say the individual should also avoid work above shoulder level

>and that the individual should not constantly use the hands for such repetitive tasks as keyboarding, could use them frequently, but not constantly. And, further, the individual is limited to simple, repetitive tasks and simple contact with the public. By simple contact with the public, I mean, for example, the kind of contact that a janitor who would clean an office building in the evenings might have, or bump into the tenants but don't have to deal with them on a regular basis.

(R. 57). The VE testified that such an individual could not return to any of plaintiff's previous work. (R. 58). When asked by the ALJ to identify all jobs that fit within the hypothetical, the VE listed: mail clerk, laundry press person, and "various types of sorting jobs." (R. 58). The ALJ then verified that an individual who actually suffers from all of the complaints testified to by plaintiff would be unable to complete an eight-hour workday, five days a week, regularly and would be ineligible for all competitive work. Id. Plaintiff's attorney asked the VE how the use of a cane would affect the jobs listed, and the VE stated it would interfere with the jobs of mail clerk and laundry presser, but should not be an issue with about half (approximately 225) of the sorting jobs, because they were actually sedentary (sitting) work. (R. 58-59).

Plaintiff's attorney then gave the VE a hypothetical of an individual who, two-thirds of the time, could not "understand and remember very short and simple instructions. Socially interact with the general public, co-worker and supervisors. Adapt to competitive work environment and carry out very short and simple instructions." The VE replied that such an individual would not be able to work at all. (R. 61). The attorney explained to the ALJ that he took the limitations from the last paragraph of Exhibit 6F, the consultative examiner's report. Id. In closing, plaintiff's attorney again requested "that a more comprehensive evaluation be done on [plaintiff's] mental condition." The ALJ took the request under advisement. Id.

**Non-Medical Records**

During a face to face contact with the Social Security Department, the reviewer noted that plaintiff had difficulty hearing, answering, and walking. However, the reviewer observed

5

plaintiff to be a fair historian, stopping when asked questions for a few moments before answering. Plaintiff walked slowly with an uneven gait and jumped approximately eight (8) times during the interview, apparently during a stabbing pain. (R. 127-128).

According to a Disability Report – Adult (R. 135-144), plaintiff's limiting conditions are neuropathy, arthritis, three discs in his neck pressing on nerves, and depression. (R. 131). He stated "I have to wear braces on both my hands, it takes me a lot longer to do anything. I am in constant pain. I have trouble sleeping, writing, using my hands. I have frequent stabbing pain. I have chronic pain in my shoulders, arms and hands. Exertion of any kind causes dizziness, pain" in answer to "How do your illnesses, injuries or conditions limit your ability to work?" Id. He claimed he became unable to work on November 7, 2007.

Plaintiff completed a Function Report – Adult (R. 156-163), dated July 29, 2008, claiming he "fixes food" for his children with assistance from his wife. (R. 139). His hobbies include fishing, camping, TV, video games, cars, and bikes. (R. 142). He claims to no longer do these things. Id. Plaintiff stated he handles changes in routine "ok," and gets along fine with authority figures. (R. 144).

**Medical Records**

**Treating Physicians**

Plaintiff visited Good Samaritan Health Services six times between March 31, 2008 and July 1, 2008, complaining of bilateral hand pain with stiffness, paresthesias (tingling and numbness; loss of sensation), and neck pain. (R. 188-217). He received an x-ray of each of his hands, and a MRI of his cervical and upper thoracic spine. (R. 199-201, 208, 210). He was treated with Lyrica (relieves neuropathic pain), naproxen (to treat inflammation and pain of

arthritis), gabapentin (treats seizures and nerve pain), skelaxin (muscle relaxer), and Ultram (narcotic-like pain reliever). (R. 191).

His x-rays showed an old fracture of the fifth metacarpal (finger) of his right hand with no other significant abnormality, both views of his left hand were normal, and the MRI revealed abnormalities at C4-C7.

Paul Peterson, M.D., of Broken Arrow Bone and Joint Specialists, examined plaintiff June 26, 2008. Dr. Peterson summarized plaintiff's complaints and history, then summarized his physical examination results. (R. 324). Dr. Peterson stated plaintiff was alert and oriented with a "flattened" affect. His cervical range of motion was limited to 20° flexion, 25° extension, 25° right lateral rotation, and 30° left lateral rotation. Plaintiff's reflexes were symmetrical at the elbows and wrists, and his grip strength was normal. Dr. Peterson noted pain with performance of a nerve compression test over the carpal tunnels, with "no wasting of the thenar musculature." Id. Dr. Peterson stated x-rays of plaintiff's "cervical spine reveal[ed] significant changes involving primarily C5-6. The MRI scan report, brought with the patient from the Northland Imaging Center, show[ed] significant degenerative changes through the lower cervical spine, most pronounced at C5-6 with narrowing of the neural foramina." Id. Dr. Peterson's impression was "[c]ervical arthritis with some evidence of raiculopathy, possibly a double crush syndrome.[2]

Dr. Peterson's recommendations were for plaintiff to continue use of splints, stretches and anti-inflammatory medication until he could process the appropriate forms to apply for Medicaid. Dr. Peterson noted that since plaintiff was uninsured, once he obtained Medicaid, Dr.

---

[2] Double crush syndrome is defined as "[a] type of peripheral nerve compression syndrome in which there is a 'central' compression that impacts on a nerve bundle—e.g., at the thoracic or pelvic outlet—and a 2nd, more peripheral compression—e.g., at the carpal or tarsal tunnel; optimal therapy requires surgical release of both." McGraw-Hill Concise Dictionary of Modern Medicine. © 2002 by The McGraw-Hill Companies, Inc.  See http://medical-dictionary.thefreedictionary.com/Double+Crush+Syndrome.

Peterson would "do [his] best to marshal him through a reasonable workup, including EMGs and possibly obtain a neurosurgical consultation." (R. 324).

An intake form from Broken Arrow Family Clinic dated March 11, 2009 shows plaintiff's complaints to be pain in his left ankle, in his shoulder, hand and back; three compressed discs in his neck; his memory is "going"; and poor balance. (R. 323). Prior surgeries were thoracic outlet syndrome in 1982 and knee surgery in 1977. Id. The physician notes indicate that plaintiff saw a doctor at OSU, that he visited Dr. Min, a neurosurgeon, March 6th, and that he received an injection in his neck at Tulsa Spine by Dr. Kalvin White. Another note states that plaintiff saw Dr. Dewitt, who was to send his records to OSU. The notes show that plaintiff complained of problems with his knee swelling and joint pain and that he had an appointment with Dr. McKay's office June 15, 2009. Id. A note on plaintiff's history forms states he sees Dr. White for pain management. (R. 322).

Plaintiff presented July 22, 2008 at OSU Family Medicine with complaints of severe neck pain and bilateral upper extremity paresthesias. (R. 218). Plaintiff was seen by Thomas Pickard, D.O. Dr. Pickard noted a decreased range of motion in plaintiff's neck, as well as decreased strength bilaterally in the upper extremities. Dr. Pickard's impressions were degenerative joint disease of the cervical spine, radiculopathy, and chronic neck pain. The plan was for plaintiff to be referred to a neurosurgeon and to continue Lyrica. (R. 219).

Plaintiff presented to Kalvin White, D.O., of Tulsa Spine & Specialty Hospital, on September 22, 2008 complaining of pain, cramping, loss of balance, and stiffness. (R. 288). He described the pain as sharp, burning, throbbing, shooting, aching, cramping, crushing, stabbing, and tingling, all with coldness, hotness and electricity. Id. He stated sitting, standing, walking, twisting, sneezing, coughing, sex, and using his arms all increased the pain, and lying down

seemed to help it. (R. 289). He mentioned high blood pressure, liver problems, and headaches as medical problems, and indicated that he had been diagnosed with depression, but was not under care for it. (R. 289, 290).

Upon physical examination, Dr. White noted:

> "[plainitff] has tenderness in his cervical paraspinals, and upper trapezius. He has a positive Tinel on the left. Muscle strength is otherwise symmetrical. Reflexes are also symmetrical. Discosteophyte complexes with moderate effacement at the thecal sac at C4-5 and C5-6 with bulging disc at C6-7."

(R. 305). Dr. White diagnosed plaintiff with cervical spondylosis, cervical radiulopathy, carpal tunnel syndrome, and neck pain. (R. 280, 303-06). He performed a cervical epidural steroid injection under fluoroscopy at C7-T1, without sedation, to try to alleviate plaintiff's symptoms. Id.

In a letter to Dr. Pickard, Dr. White stated plaintiff reported no significant improvement with the initial injection, so on October 6, 2008, plaintiff received another injection at the C4 location. (R. 257-258, 269-270, 300-302). In a second letter to Dr. Pickard dated November 17, 2008, Dr. White informed him the October 6, 2008 procedure resulted in minimal improvement in plaintiff's neck and shoulder pain. At this November 17th visit, Dr. White again repeated the procedure at the C4-5 location and refilled his pain medication. (R. 297-301).

On November 3, 2008, Cornelia O. Mertiz, D.O., of OSU Physicians, completed a handicap parking application, requesting a temporary placard for plaintiff, stating plaintiff could not walk 200 feet without stopping to rest, and he could not walk without the use of an assistive device, such as a brace or cane. (R. 253). Notes from OSU Physicians dated November 3, 2008 show plaintiff had decreased strength bilaterally in his upper extremities, and decreased range of motion in his neck. (R. 310). Dr. Mertz's impressions were disc osteophyte complex with

9

significant narrowing of C5-C6 foramina, and anterior cord impingement at C4-C5. Dr. Mertz's plan was an urgent referral to a neurosurgeon. (R. 311).

On January 8, 2009, plaintiff was diagnosed with strep pharyngitis and radiculopathy. Jeffrey Chasteen, D.O. gave him a prescription and referral to neurology. (R. 309). On March 2, 2009, John DeWitt, D.O., F.A.A.N., wrote to Dr. Chasteen after examining plaintiff. (R. 312-313). Dr. DeWitt performed an electromyographic study of both of plaintiff's arms. The results were normal, and Dr. DeWitt could find no "organic" explanation for plaintiff's difficulties. He stated plaintiff had a very mild case of carpal tunnel syndrome which did not need surgical intervention, and some minor cervical spondylosis, which was not causing any cord compression or neurologic dysfunction. (R. 313). In his report, which accompanied his letter, Dr. DeWitt detailed his testing and results. (R. 314-316).

Plaintiff presented to David Min, M.D. on January 6, 2009, for a pain evaluation with complaints of pain in his neck which radiated into his shoulders and down both arms, on the left side more than the right. Plaintiff complained his pain was "working down his back." He also complained of balance problems, pain in his right knee, and weak hands which gave him a tendency to drop things. (R. 343). His medication list included oxycodone-acetaminophen (7.5/325) (pain relief), Tramadol HCL (narcotic-like pain reliever), Baclofen (muscle relaxer), and Gabapentin (nerve pain treatment).

Upon physical examination and testing, Dr. Min discovered plaintiff could heel-toe walk well; his finger to nose test was normal; reflexes were symmetric, Achilles reflexes were absent bilaterally. Dr. Min stated plaintiff was "well developed, nourished, overweight" and "appear[ed] his stated age." (R. 344). His toes were "downgoing" bilaterally. No clonus or Hollmann's sign were present bilaterally. Dr. Min noted plaintiff's mood was normal with no

10

evidence of depression or anxiety. Id.  Plaintiff's gait was noted as moderately antalgic; no gross abnormalities or tenderness were noted in his arms bilaterally.  Dr. Min found full range of motion in his shoulders, elbows, and wrists without pain with no instability in the shoulders, elbows, or wrists. (R. 344-345).  Dr. Min was unable to measure plaintiff's strength, as plaintiff would "giveaway with any effort," however, his tone was noted to be normal with no evidence of atrophy. (R. 345). Dr. Min noted the same results with plaintiff's legs bilaterally. Id.

Dr. Min discussed plaintiff's MRI results, which showed only mild herniation at C5-6, and a "slight abutment of the herniation to the exiting C6 nerve root" with no evidence of cord compression. Id. Dr. Min's assessment was as follows:

> Diffuse symptoms - his symptoms are not localizable to a specific source from a clinical standpoint.  I have told him that his disc "herniation" is mild at best and certainly nothing that I would recommend surgery for.  I have told him that he needs to see a Neurologist to have his progressive symptoms evaluated with an EMG/NCS because his MRI scan of his cervical spine does not show the etiology of his symptoms.
>
> As he has no significant lesions on his cervical MRI scan, I have nothing to offer him.

Id.

Plaintiff returned to the Broken Arrow Family Clinic for a follow up visit April 1, 2009, stating he was still in pain. (R. 340).  No notes regarding care or assessment are listed on this visit.

On May 11, 2009, notes show plaintiff wanted "to know what Dr. Johnson said," telling Brian Coder, D.O. that Dr. Jay Johnson would not accept him as a patient as Dr. Johnson did not accept adult Medicaid. (R. 339).  He was diagnosed with chronic neck pain, memory loss, and severe hypertension.  His medications were adjusted.

On May 19, 2009, plaintiff presented to the Broken Arrow Family Clinic for a blood pressure checkup. He stated his neck hurt, worse on his left shoulder. Plaintiff rated his pain as a nine (9) on a scale of one (1) to ten (10). He was again diagnosed with hypertension, chronic neck pain, and memory loss. (R. 338).

Plaintiff visited Jay Johnson, D.O., of Tulsa Neurology Clinic, on April 27, 2009. In a letter to Dr. Coder, Dr. Johnson recited plaintiff's complaints, noting plaintiff claimed his pain had steadily increased over the previous two (2) years. (R. 332). Upon examination, Dr. Johnson noted plaintiff was alert and cooperative, his speech fluent. Dr. Johnson stated plaintiff "ha[d] marked exaggeration of his symptoms and marked pain behaviors." (R. 333). Plaintiff's motor examination revealed:

> ...that his motor exam was quite unusual. He would take a number of seconds before he would move. He had breakaway weakness in all muscles tested. His motor patterns were very inconsistent. He could straighten his hand at one point and then had difficulty straightening his hand at another or at least extending the digits. It was very difficult to follow but I do not see any gross atrophy. There are no fasciculations. There is marked symptom magnification.

Id. Further examination showed:

> The sensory exam revealed intact sensation to pin in the face. In the upper and lower extremities, it did not follow any particular dermatome or peripheral nerve pattern. He seemed to feel at least pin better in the lower extremities than the upper extremities. His position sense was unremarkable.
>
> His gait was such that he used a cane. He walked very slowly. He turned very slow. For the way he looked and his gait, there was a clear disassociation.
>
> …
>
> He had decreased range of motion in both arms.

(R. 334). Dr. Johnson's impression was that plaintiff had "memory loss, pain in the neck and thoracic region the etiology of which is uncertain. He [wa]s having gait imbalance as well. There is marked overlay." Dr. Johnson planned to send plaintiff for a MRI scan of the brain and

12

cervical spine, request his EMG results from Dr. Dewitt, and study him further after receiving the results.  Id.

Plaintiff cancelled his follow up appointment with Dr. Johnson.  In a letter dated May 5, 2009 to Dr. Coder, Dr. Johnson discussed plaintiff's MRI results, stating it revealed "some degenerative changes and disc bulging without neural compression" primarily at C4-5 and C5-6. The MRI of plaintiff's brain was normal.  He discussed the EMG study from Dr. Dewitt. Ultimately, Dr. Johnson concluded that plaintiff did not have a neurologic etiology for plaintiff's symptoms.  (R. 331).

**Agency Physicians**

Plaintiff was examined by Allen W. Sweet, Ph.D. on October 8, 2008 in conjunction with his application for disability benefits.  Dr. Sweet recounted initial impressions of plaintiff's movements and actions, stating his wife filled out the paperwork for him to sign, that he walked slowly "with almost a limp" after rising with difficulty.  Dr. Sweet noted during the evaluation that plaintiff sat "very stiffly," as though his neck was very stiff.  (R. 222).  None of plaintiff's medical records were provided to Dr. Sweet.  Plaintiff described his daily activities as washing the morning dishes, which he stated "takes [him] a while," he made the bed and vacuumed, but said "that takes forever."  Plaintiff claimed he had no hobbies and did not participate in social activities.  (R. 222-223).

Dr. Sweet's impression of plaintiff was:

> Kevin impressed the examiner as an individual who is very vague about many aspects of his history.  He claimed he couldn't remember why he had an Article 15 conviction while in the Army.  He couldn't explain why he quit nursing.  He is fairly nonspecific about his current issues except that his 'hands hurt a lot' and that he has three bad discs in his neck.  He appears to be taking Neurontin, Depakote and Seroquel.  When asked who is prescribing that for him his only response was 'my son's psychiatrist.'  As no records were supplied, there is no historical context in which to view his current complaints and daily functioning.

13

> It appears to the examiner that a pain diagnosis and a mixed reactive anxiety/depression appear to be reasonable descriptions of his current level of adjustment. It is the examiner's opinion that William Kevin Asay's ability to do work related mental activities such as understanding and remembering appear to be moderately to significantly impaired. His ability to sustain concentration and to persist at work required activities appears to be significantly impaired. In his ability to socially interact with others and to adapt to a competitive work environment appear moderately to perhaps significantly impaired.
>
> Axis I:  Pain Disorder Associated With Both Psychological Factors and a General Medical Condition 307.89;
> Adjustment Disorder With Mixed Anxiety and Depressed Mood 309.28
> Axis II:  No DiagnOSis 71.09
> Axis III:  Disk disorder, intervertebral, cervical, by self-report 722.91
> Axis IV:  Problems with primary support group; Occupational problems; Housing problems; Economic
> problems; Problems with access to health care services
> Axis V:  GAF54
>
> It is the examiner's opinion that William Kevin Asay is able to manage in his own interest and to his own benefit any monetary benefit payments granted to him.

(R. 224).

Carolyn Goodrich, Ph.D., an agency reviewer, completed a Psychiatric Review Technique form for plaintiff dated October 9, 2008. (R. 227-240). Dr. Goodrich assessed the areas of Affective Disorders (12.04), Anxiety-Related Disorders (12.06), and Somatoform Disorders (12.07). As to Affective and Anxiety-Related Disorders, Dr. Goodrich noted plaintiff suffered adjustment disorder. As to Somatoform Disorders, Dr. Goodrich listed pain disorder as the impairment. (R. 230, 232-233). Under functional limitations, Dr. Goodrich rated plaintiff to have mild restriction of activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace, and found no episodes of decompensation. (R. 237). The "C" criteria of the listings were not rated. (R. 238).

14

In the section "Consultant's Notes," Dr. Goodrich noted plaintiff's Disability Report - Adult showed no treating source for any mental condition, and no prescription for antidepressant medication. Further, she noted plaintiff's medical evidence of record showed no complaint or diagnosis of depression, surmising plaintiff prescription for Cymbalta in July, 2008 may have been used for pain control. She noted one mention of "alcoholic." She mentioned two independent examinations where plaintiff's psychiatric functions were summarized as basically normal, then went on to discuss part of Dr. Sweet's consultative examination, reciting diagnoses of pain disorder and adjustment disorder. She also recited plaintiff's activities of daily living from the Function Report - Adult form plaintiff completed. (R. 239).

Dr. Goodrich then completed a Mental RFC form for plaintiff, finding he had moderate limitations in the ability to understand and remember detailed instructions, and the ability to carry out detailed instructions. Plaintiff was also rated moderately limited in his ability to interact appropriately with the general public. All other areas were rated as "not significantly limited." Under the Functional Capacity Assessment, Dr. Goodrich noted plaintiff could perform simply and some complex tasks, relate to others on a superficial work basis, and adapt to a work situation. (R. 241-244).

Thurma Fiegel, M.D., gave plaintiff the following physical RFC on October 10, 2008:

Occasionally lift and/or carry 20 pounds,
Frequently lift and/or carry 10 pounds,
Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday,
Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and
Push and/or pull (including operation of hand and/or foot controls - unlimited, other than as shown for lift and/or carry.

(R. 246). No postural, manipulative, visual, communicative, or environmental limitations were found. (R. 247-249).

15

Phillip Massad, Ph.D., an agency physician, confirmed Dr. Goodrich's determination of October 9, 2008 as written on January 15, 2009. (R. 292). Janet G. Rodgers, M.D., another agency physician, confirmed Dr. Fiegel's findings of October 10, 2008 as written on January 15, 2009. (R. 293-294).

### Decision of the Administrative Law Judge

At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity since November 7, 2007, his alleged onset date. (R. 14). At step two, the ALJ determined plaintiff's severe impairments to be degenerative disc disease of the cervical spine, mild carpal tunnel syndrome, somewhat obese, pain disorder, and adjustment disorder with depression and anxiety. Id. At step three, the ALJ determined plaintiff's severe impairments do not meet or equal a listing, specifically considering 1.00, *et seq.*, (Musculoskeletal) and 12.00, *et seq.* (Mental Disorders). (R. 14). Before moving on to step four, the ALJ assigned the following RFC to plaintiff:

> … [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he should avoid work above shoulder level. Due to degenerative disc disease of the cervical spine, he should be required to lift or carry no more than 20 pound occasionally and he should avoid work above shoulder level, which puts a strain on his neck. Furthermore, the claimant should not engage in the constant use of the hands for such repetitive task as keyboarding and he should be limited to simple, repetitive tasks and incidental contact with the public.

(R. 16). At step four, the ALJ determined plaintiff had no past relevant work. (R. 22). At step five, the ALJ determined there were other jobs in significant number in the national economy which plaintiff could perform, to include a mail clerk, a laundry presser, and a sorter. (R. 23). The ALJ therefore concluded plaintiff had not been under a disability as defined by the Act, since November 7, 2007, the alleged date of his onset of disability.

**Issues on Appeal**

Plaintiff states the ALJ's decision should be remanded with instruction or for award of benefits due to the following alleged errors:

1. The ALJ failed to fully develop the record;

2. The ALJ failed to properly consider Dr. Sweet's opinion;

3. The ALJ failed to properly consider the plaintiff's credibility; and

4. The ALJ failed to consider the plaintiff's proper age.

**Discussion**

Plaintiff first alleges that the ALJ failed to fully develop the record by not developing the theory that plaintiff could be suffering from a somatoform disorder. The Court agrees.

Plaintiff argues ample evidence exists to suggest that "part, if not most, of the plaintiff's pain is psychologically based. Recognizing this, the plaintiff's representative requested additional mental testing. Tr. 61. The request was not granted." (Dkt. # 15 at 7). Plaintiff states the ALJ's duty to develop the record is triggered when there is "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." Hawkins v. Chater, 113 F.3d 1162, 1167 (10th Cir. 1997).

Defendant responded that plaintiff bears the burden of proving his case. While this is true, and the ALJ ordinarily should be entitled to rely upon a claimant's counsel at a hearing to present that claimant's claims adequately, the ALJ remains obligated to develop an issue which is brought to his attention and could have a material impact on the disability decision. Id. In the instant case, plaintiff's representative specifically pointed to exhibits 6F and 8F in the record and requested the ALJ further develop the record with respect to a somatoform disorder. (R. 37, 61).

The ALJ took this request under advisement, but did not discuss the request further in his decision. (R. 61).

Nonetheless, the ALJ discussed several pieces of evidence that would lend to the question of a somatoform disorder, including records from OSU College of Osteopathic Clinic, Good Samaritan Health Services, Paul Peterson, M.D., Kalvin White, D.O., Thomas Pickard, D.O., David Min, M.D., John DeWitt, D.O., Jay Johnson, D.O., and Allen Sweet, Ph.D. (R. 17-22). Several of these examining and/or treating physicians could not pinpoint a physical cause for plaintiff's symptoms. Upon remand, the ALJ is instructed to further develop the theory of a somatoform disorder.

Plaintiff's second allegation of error is that the ALJ failed to properly consider Dr. Sweet's opinion. This argument has merit. Defendant attempts to use a post hoc argument to salvage the ALJ's treatment of Dr. Sweet's report. The ALJ did not reference the same parts of the record utilized by defendant to support his argument. The ALJ simply stated:

> "[t]he undersigned assigns some weight to Dr. Sweet's mental health assessment. Although Dr. Sweet opined that claimant's ability to do work related mental activities were moderately to significantly impaired, his only behavioral health diagnosis was an adjustment disorder with mixed anxiety and depressed mood."

(R. 22). In any event, the ALJ will need to re-evaluate the Consultative Examiner's opinion during the course of his investigation into a somatoform disorder.

Plaintiff next argues that the ALJ's credibility analysis was faulty. The Court agrees. Speaking to plaintiff's credibility, the ALJ simply stated, "the claimant presented with extreme allegations of pain, but the doctors simply cannot explain the cause based on the objective evidence of record." Id. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, [f]indings as to credibility should be closely and affirmatively linked to substantial

evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir.1995) (quotation and citation omitted). The ALJ must "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible." Id. Based on the fact the ALJ is instructed to further develop the possibility of a somatoform disorder, the ALJ will also be required to revisit his credibility determination.

Plaintiff's final allegation of error is that the ALJ failed to consider plaintiff's correct age. This argument does not have merit. The ALJ listed plaintiff to be 49 years old at the date of onset. (R. 22). While this was plaintiff's true age at the time of application, the accepted practice in the Tenth Circuit is to take a person's age at the time of the ALJ's decision, which made plaintiff 51 years old. Either way, the ALJ stated plaintiff was "an individual closely approaching advanced age," and application of the Grids, with a light RFC, still classified plaintiff as "not disabled." If the ALJ changes plaintiff's RFC as a result of his investigation into a somatoform disorder, the Grid rules will need to be revisited as well.

## Conclusion

For the above stated reasons, this Court REVERSES and REMANDS the Commissioner's denial of Disability Insurance Benefits.

SO ORDERED this 19th day of January, 2012.

_____
T. Lane Wilson
United States Magistrate Judge

19